IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES DONALD DIETER III,     )     CASE NO. 3:25-CV-00265
          )
         Plaintiff,     )     DISTRICT JUDGE JAMES R. KNEPP II
          )
         v.     )     MAGISTRATE JUDGE
          )     AMANDA M. KNAPP
COMMISSIONER OF SOCIAL     )
SECURITY ADMINISTRATION,     )
          )     **REPORT AND RECOMMENDATION**
         Defendant.     )

Plaintiff James D. Dieter ("Plaintiff" or "Mr. Dieter") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Social Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

On June 27, 2022, Plaintiff filed an application for SSI. (Tr. 193.) He alleged a disability onset date of November 1, 2021. (*Id.*) He alleged disability due to degenerative disc disease, arthritis, lumbar disc herniation, anxiety, public phobia, ADHD, depression, and Hoffman's reflex. (Tr. 205.) Plaintiff's application was denied at the initial level (Tr. 98) and upon

1

reconsideration (Tr. 122), and he requested a hearing (Tr. 125).  On December 5, 2023, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 40-69.)

On December 28, 2023, the ALJ issued a decision finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from June 27, 2022, through the date of the decision.  (Tr. 17-39.)  On December 12, 2024, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On February 12, 2025, Plaintiff filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 7, 8, 9.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Plaintiff was born in June 1999, and was 23 years old on the date he filed his application, making him a younger individual under Social Security Regulations at all relevant times.  (Tr. 32.)  He has at least a high school education.  (*Id.*)  Plaintiff has not worked since June 27, 2022, the application date.  (Tr. 19.)

### B.     Medical Evidence

While the ALJ found Mr. Dieter had several severe and non-severe impairments (Tr. 20), Mr. Dieter only challenges the ALJ's findings regarding his obesity and mental impairments (ECF Docs. 7, 9).  The medical records summarized herein are therefore limited to the medical evidence regarding Mr. Dieter's obesity and mental impairments.

#### 1.     Relevant Treatment History

##### i.     Treatment Related to Physical Impairments

In March 2022, prior to the alleged onset date, Mr. Dieter attended a primary care treatment visit via video with Certified Nurse Practitioner ("CNP") Assumpta Nnaji.  (Tr. 432-

2

36.)  His listed diagnoses included class 3 severe obesity with serious comorbidity and a body mass index (BMI) of 50.0 to 59.9.  (Tr. 435.)  CNP Nnaji advised him on a healthy diet and the need for regular exercise. (Tr. 435-36.)

Mr. Dieter returned for an in-person visit with CNP Nnaji in May 2022 (Tr. 425-30), when his weight was measured at 329 lbs. and his BMI was 50.05 (Tr. 428).  CNP Nnaji discussed the importance of weight loss with Mr. Dieter, advised him on diet, encouraged him to exercise, and explained that his excessive body weight could cause his back pain.  (Tr. 430.)

At a June 2022 office visit with CNP Nnaji (Tr. 420-25), Mr. Dieter's weight was 326 lbs. and his BMI was 49.61 (Tr. 423).  CNP Nnaji discussed the importance of losing weight to decrease back pain, and offered weight loss medication.  (Tr. 424.)  Mr. Dieter said he did not want to focus on weight loss until he took care of his back.  (*Id*.)  CNP Nnaji advised that losing weight would help to ease back pain, encouraged exercise, and prescribed diet education.  (*Id*.)

At a July 2022 office visit with CNP Nnaji (Tr. 408-13), Mr. Dieter's weight was 324 lbs. and his BMI was 49.40 (Tr. 411).  CNP Nnaji again discussed the importance of losing weight and offered weight loss medication, but Mr. Dieter again declined. (Tr. 412.)

At a January 2023 office visit with CNP Nnaji (Tr. 501-07), Mr. Dieter reported that he was actively trying to lose weight, but had not been successful and was motivated to try other options (Tr. 502).  His weight was 334 lbs. and his BMI was 50.89. (Tr. 504.)  CNP Nnaji prescribed Adipex and Topamax for weight loss. (Tr. 506.)  He returned to CNP Nnaji later that month, complaining of side effects from his new medications.  (Tr. 495.)  CNP Nnaji instructed him to continue taking Topamax but decrease his dosage of Adipex. (Tr. 499.)

When Mr. Dieter returned to CNP Nnaji in February 2023 (Tr. 535-41), his weight was down to 321 lbs. and his BMI was 48.82 (Tr. 539).  He was taking Topamax twice daily but

Adipex had been discontinued because he did not tolerate it well. (Tr. 535.)  Although he had lost 8 lbs. since his last appointment, Mr. Dieter elected to discontinue Topamax as well.  (*Id.*) He felt that he did not need the medication and could lose weight without it; he had cut out all pop and intended to walk daily when the weather improved. (Tr. 535-36.)  CNP Nnaji advised that Topamax could help curb his appetite and increase metabolism, but Mr. Dieter was confident that he could get his weight down on his own. (Tr. 536.)

At an office visit with CNP Nnaji in June 2023 (Tr. 643-48), Mr. Dieter complained of palpitations that began when he started Adipex for weight loss (Tr. 643).  The problem was intermittent and gradually improving. (*Id.*)  He reported taking daily walks during the summer, and that the rate and time of his daily walks had increased; he intended to continue daily walks to help with weight loss. (Tr. 643.)  His weight was 320 lbs. and his BMI was 48.79 (Tr. 647).  At a August 2023 office visit (Tr. 635-40), his weight was 313 lbs. but his BMI was 49.14 (Tr. 639).

### ii.    Treatment Related to Mental Impairments

In January 2022, before the alleged onset date, Mr. Dieter established care with primary care provider CNP Nnaji. (Tr. 442.)  He reported anxiety that was gradually worsening, exacerbated when he was outside in public; he said his symptoms were severe and had caused the loss of two jobs.  (*Id.*)  He treated his anxiety by listening to music, which provided mild relief.  (*Id.*)  He also reported a childhood diagnosis of ADHD, for which he had previously taken medication. (*Id.*)  On examination, he was alert and oriented with normal attention, perception, affect, speech, thought content, cognition, memory, and judgment, but his mood was anxious; his behavior was cooperative but withdrawn. (Tr. 445.)   CNP Nnaji prescribed clonidine and Buspar for anxiety.  (*Id.*)

In February 2022 (Tr. 437-41), Mr. Dieter complained that Buspar was not working (Tr. 437, 441) and CNP Nnaji discontinued Buspar and prescribed Prozac (Tr. 441).  Mr. Dieter also reported that his ADHD was back and wanted to start medication for ADHD.  (Tr. 437.)  His mental status examination findings were normal. (Tr. 440.)  In March 2022, his anxiety levels had improved with Prozac, but he still got anxious "occasionally once in a while." (Tr. 432.)  He had been sent to a psychiatrist for ADHD, but they were not open for new patients until May 2022.  (*Id.*)  CNP Nnaji continued clonidine and increased his Prozac dosage.  (Tr. 435.)  In May 2022, he reported that his anxiety had improved with Prozac and clonidine; the symptoms were mild to moderate and they occurred occasionally.  (Tr. 426.)  His mental status findings were normal, and his medications were continued.  (Tr. 429.)  In June 2022, he reported that his anxiety symptoms were stable with Prozac and clonidine; the symptoms were mild and occurred occasionally. (Tr. 421.)  His mental status findings remained normal.  (Tr. 423-24.)

Mr. Dieter's Prozac and clonidine were refilled in August 2022, after the alleged onset date.  (Tr. 398.)  In September 2022, he reported that his anxiety symptoms were waxing and waning but improved; the symptoms were mild and occurred occasionally.  (Tr. 389.)  His mental status findings were normal.  (Tr. 392-93.)

Mr. Dieter began treatment with psychiatrist Jatinder S. Rana, M.D., in January 2023. (Tr. 612-14.)  He reported struggling with depression, anxiety, and ADHD since childhood.  (Tr. 612.)  He said he was taking Prozac and clonidine, which helped with social anxiety and depression, but they did not help with his ADHD symptoms.  (*Id*.)  Dr. Rana diagnosed ADHD, social phobia, and major depressive disorder, prescribed Strattera, continued his Prozac and clonidine, and recommended individual counseling.  (Tr. 613-14.)  At two primary care visits that month, CNP Nnaji observed that Mr. Dieter displayed normal attention, perception, speech,

behavior, thought content, cognition, memory, and judgement, but with an anxious mood and flat affect on one of the visits.  (Tr. 499, 505.)

At a psychiatric office visit with Dr. Rana in February 2023 (Tr. 611-12), Mr. Dieter reported that Strattera was "working well" for his focus and concentration, but he was having palpitations and tachycardia caused by the combination of Prozac and Strattera (Tr. 611).  He reported that his anxiety was controlled, and that he felt Strattera was helping him more than Prozac; he intended to ask his primary care provider to discontinue Prozac. (*Id.*)  Dr. Rana advised Mr. Dieter to hold Strattera until after his Prozac had been discontinued.  (*Id.*)

At an office visit with CNP Nnaji the next day (Tr. 681-88), Mr. Dieter reported that his psychiatrist had told him Prozac was interfering with his Strattera (Tr. 682).  He told CNP Nnaji that he wanted to be off Prozac because his anxiety had improved; he did not think he needed any medication for anxiety at that time, but did want to continue on clonidine.  (*Id.*)  His mental status findings were normal.  (Tr. 686.)  CNP Nnaji instructed him to wean off Prozac.  (Tr. 687.)

At an office visit with Dr. Rana in March 2023 (Tr. 609-10), Mr. Dieter reported that Strattera was helping with his ADHD symptoms, his side effects had resolved, and his anxiety was "doing OK" with clonidine alone (Tr. 609).  In April 2023 (Tr. 608-09), Mr. Dieter reported that his depression and anxiety were "stable" with clonidine, but that he did not feel Strattera was helping with his ADHD.  (Tr. 608.)  Dr. Rana increased his Strattera dosage. (*Id.*)

At an office visit with CNP Nnaji in May 2023 (Tr. 674-80), Mr. Dieter complained of increased anxiety since Prozac was discontinued (Tr. 675).  His mental status findings remained normal. (Tr. 678-79.)  CNP Nnaji prescribed Atarax for anxiety as needed, but advised Mr. Dieter to discuss other anxiety medication options with Dr. Rana so that they could find the best medication to avoid interactions with Strattera. (*Id.*)

At his next appointment with Dr. Rana in May 2023 (Tr. 630-31), Mr. Dieter reported his depression was mild, but his anxiety was high when he went out in crowds (Tr. 631).  His focus and concentration were about the same, with no adverse side effects.  (*Id*.)  Dr. Rana increased the Strattera dosage, continued hydroxyzine (Atarax), and added a referral to Rachel Sass.  (*Id.*)

In June 2023 (Tr. 629-30), Mr. Dieter reported that he felt anxious at least a couple of times per day (Tr. 629).  He had not noticed any improvement in focus and concentration with Strattera but was not having any adverse side effects.  (*Id*.)  Dr. Rana increased the dosage for both Strattera and hydroxyzine and continued the referral to Rachel Sass. (Tr. 630.)

In July 2023 (Tr. 627-29), Mr. Dieter reported to Dr. Rana that his mood was good, but his focus and concentration had not gotten any better (Tr. 628).  He was not attending counseling.  (*Id*.)  Dr. Rana discontinued Strattera, prescribed Vyvance, refilled hydroxyzine, and continued the referral to Rachel Sass. (*Id*.)  Two weeks later (Tr. 626-27), Mr. Dieter reported that his mood was stable and his anxiety was mild; he denied depression (Tr. 626).  He felt that Vyvanse was helping with his focus and concentration, explaining that he was "more patient, less 'flighty.'" (*Id*.)  He said that "other people ha[d] noticed a big difference." (*Id*.)  Dr. Rana continued his medications as prescribed. (*Id*.)

Mr. Dieter returned to see Dr. Rana in August 2023. (Tr. 625-26.)  He reported that Vyvanse was working; he was able to focus and concentrate better and was binge eating less. (Tr. 625.)  However, he reported mild depression and increased anxiety.  (*Id*.)  He said that hydroxyzine did not seem to work for anxiety and made him sleepy.  (*Id*.)  He noted that Prozac had been stopped when he was on Strattera, but that he was no longer on Strattera.  (*Id*.)  Dr. Rana continued Vyvanse, discontinued clonidine, and restarted Prozac.  (*Id*.)

In September 2023 (Tr. 623-24), Mr. Dieter reported to Dr. Rana that he was able to focus and concentrate better, and that his depression and anxiety were reduced and controlled (Tr. 623).  Dr. Rana refilled Mr. Dieter's hydroxyzine, Prozac, and Vyvanse.  (Tr. 624.)

## 2.    Opinion Evidence

### i.    Consultative Psychological Examination

Mr. Dieter attended a psychological examination with John S. Reece, Psy.D., via video on February 23, 2023.  (Tr. 552-57.)  He reported that he was taking Prozac and clonidine prescribed by his primary care provider and Strattera prescribed by a psychiatrist.  (Tr. 554.)  He described his typical mood as "pretty good," but noted problems falling asleep and staying asleep due to pain.  (Tr. 554.)  He also reported problems with anxiety and nervous feelings when he was in a group of people or in public, with a history of anxiety / panic attacks, but not recently. (*Id*.)  His most recent work was in 2021, but he said he quit because of anxiety and work stress caused by contact with co-workers. (*Id*.)  He reported that he spent his day doing personal care tasks, doing household tasks, sometimes going on errands, and playing video games.  (Tr. 555.)  He said that he socialized regularly in person and via telephone with his siblings, but did not participate in structured social activities.  (*Id*.)  He sometimes shopped and was able to cook, and his reading, writing, spelling, and arithmetic skills were good.  (*Id*.)

On examination, Mr. Dieter was clean, neatly dressed, and cooperative to passively cooperative.  (*Id*.)  He demonstrated pain-related behavior like shifting in his seat and grimacing. (*Id*.)  His eye contact was inconsistent to poor, his facial and gestural expressiveness was minimal, and his tone of voice was monotone to normal, but there was no observed psychomotor retardation or agitation.  (*Id*.)  He demonstrated an outward sign of anxiety through rigid posture. (*Id*.)  He spoke directly, with short responses, unimpaired speech, and well-organized

associations; but vagueness was observed, there was an impression of defensiveness, and he often paused before responding.  (*Id.*)  His mood was mildly anxious and his affect was constricted to flattened.  (*Id.*)  He was alert and fully oriented, with adequate short-term memory and good to fair working memory.  (*Id.*)  His concentration and task persistence were satisfactory but his pace of problem solving was slightly slowed to slowed.  (Tr. 556.)  His insight into his mental health concerns was fair to adequate.  (*Id.*)

Dr. Reece's diagnostic impression was Unspecified Anxiety Disorder with Dependent and Schizoid Personality Traits.  (*Id*.)  Mr. Dieter reported never having managed his finances or lived independently, and Dr. Reece concluded that he was able to make important decisions about his future but unable to seek appropriate community resources.  (*Id.*)  Dr. Reece also found Mr. Dieter was unable to manage his finances "due to lack of experience."  (Tr. 557.)

With respect to the four categories of mental functioning, Dr. Reece opined as follows "based on a minimal work history, of brief duration":

**Claimant's abilities and limitations in understanding, remembering and carrying out instructions**

The claimant was able to follow directions in the exam. He reported no problems with simple instructions.

**Claimant's abilities and limitations in maintaining attention and concentration, and maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks**

The claimant had no difficulty with concentration in the exam. He reported no problems performing repetitive tasks in the past workplace.

**Claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting**

The claimant reported a history of no significant other relationships. He reported dependent schizoid personality traits. He reported no problems with supervisors but avoided contact with co-workers in the past workplace.

**Claimant's abilities and limitations in responding to work pressures in a work setting**

The claimant reported having social supports. He reported that he would quit when dealing with stress and pressure in the past workplace. A current deficit in dealing with stress and pressure in the workplace is anxiety.

(Tr. 557 (emphasis in original).)

### ii.    State Agency Consultants

On December 7, 2022, state agency medical consultant Steve McKee, M.D., reviewed the record and opined that Plaintiff could: occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand and/or walk and sit, with normal breaks, about 6 hours total in a normal 8-hour workday; frequently climb ramps/stairs; never climb ladders/ropes/scaffolds; frequently balance; and occasionally stoop, kneel, crouch, and crawl.  (Tr. 74-75.)  He also opined that Mr. Dieter should avoid all exposure to hazards such as heavy machinery and unprotected heights. (Tr. 75.)  On May 20, 2023, state agency medical consultant Sheryl Smith, reviewed the record and concurred with the earlier opinion of Dr. McKee, except that she found Mr. Dieter could stand and/or walk, with normal breaks, for about 4 hours in an 8-hour workday. (Tr. 87-88.)

On March 2, 2023, state agency psychological consultant Audrey Todd, Ph.D., reviewed the record and opined that Mr. Dieter should:

- work in environments without strict production quotas. He should be given occasional breaks to prevent worsening any psychological symptoms that may arise. He should not have to coordinate or work alongside others to complete tasks;

- be limited to work environments with infrequent interactions with the general public, as well as coworkers. Interactions should be superficial if they are to happen; and

- work in environments without change.

(Tr. 76-78.)  On June 7, 2023, state agency psychological consultant Barry Rudnick, M.D., reviewed the record and concurred with the opinion of Dr. Todd.  (Tr. 88-90.)

**C.      Hearing Testimony**

**1.      Plaintiff's Testimony**

Mr. Dieter testified that he was 5 feet 7.5 inches tall and weighed 315 pounds at the time

of the hearing.  (Tr. 48.) He lived with his mother in a house that had only one stair leading to the

front door.  (*Id*.)  His brother worked to pay the household bills.  (Tr. 49.)  He finished high

school but did not have a driver's license due to his anxiety.  (*Id*.)  When he needed to go

somewhere, someone else drove him.  (Tr. 50.)

His was able to manage his own self-care and hygiene, but showered using a shower

chair.  (Tr. 50, 60.)  He had panic or anxiety attacks a couple of times per week.  (Tr. 59.)

When he tried to work as a materials processor and handler, he found himself freezing

up, and kind of getting nonverbal. (Tr. 50.)  He left that job due to anxiety and panic attacks.

(*Id*.)  He saw a psychiatrist monthly but had never been in counseling.  (Tr. 51.)

His ability to work was also limited by his lower back pain, which was constant. (*Id*.)

The pain sometimes spread to his upper back, hips, and legs. (Tr. 57.)  He could walk 10 or 15

minutes at most and sit for about half an hour before he had to get up and switch positions.  (Tr.

52.)  He could lift 10 to 15 pounds. (*Id*.)  He could not stand at the stove long enough to cook his

own meal. (Tr. 53.)  His daily activities included watching tv, playing video games, listening to

music, looking things up online, photography and photo editing, and vacuuming his room.  (Tr.

53-6.)  He napped daily because he had trouble sleeping at night.  (Tr. 59.)  His mother did his

laundry and household chores. (*Id*.)  He left the house about once a month to go grocery

shopping, and only saw friends and family when they came to his home. (Tr. 54.)  He went

outside to take photos of nature. (Tr. 55.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's Residual Functional Capacity ("RFC") determination, could perform representative positions in the national economy, including sorter, assembler, and packer.  (Tr. 61-62.)  If the individual was off task 20 percent or more of the workday or needed to lie down during the workday outside of normal breaks, the VE testified that would be work preclusive. (Tr. 63.)

In standard competitive employment, the VE testified that workers get two 15-minute breaks and a 30-minute lunch, need to be on task for 85% of the workday, and are allowed to miss up to 1.5 days per month.  (Tr. 63.)  When asked whether the employer or employee determines the time and duration of the lunch or break period, the VE answered that "[t]he lunch and break periods come after working for two hours," but that the employer determines the time and duration.  (Tr. 64.)  If an individual required additional unscheduled breaks outside of the normal lunch and break periods, the VE testified that it would be not tolerated if it went beyond being off task for 15% of the workday.  (*Id.*)  Considering the standard 30-minute lunch and two 15-minute breaks, the VE explained that an individual could therefore be off task for up to an additional 12 minutes throughout the workday, but not for 12 minutes all at once.  (Tr. 66-68.)

Plaintiff's counsel also asked: "if a hypothetical individual due to their size and weight would require the use of a bariatric chair, is that something that would normally require some sort of accommodation by the employers?"  (Tr. 65.)  The VE answered yes.  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his January 3, 2024 decision, the ALJ made the following findings:[2]

1.    The claimant has not engaged in substantial gainful activity since June 27, 2022, the application date.

2.    The claimant has the following severe impairments: Attention Deficit Hyperactivity Disorder, Social Phobia, Major Depressive Disorder, Degenerative Disc Disease of the lumbar spine with neuritis and spondylosis; and Obesity.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(b) except: He can frequently climb ramps and stairs, never climb ladders, ropes, and scaffolds. He can frequently balance. He can occasionally stoop (defined as bending at the waist) kneel, crouch (defined as bending at the knees) and crawl. He is to avoid all exposure to unprotected heights and dangerous machinery. He can do work in environments without strict production quotas. he can do no team or tandem tasks or work that has to be done alongside of others in order to complete tasks. He is limited to occasional, brief and superficial interactions with supervisors, coworkers, and the general public. Superficial defined as, able to be in proximity of others, able to exchange greetings, and able to engage in discussions that do not require persuasion, or involve team or tandem tasks. Interactions should be restricted to what

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

is necessary to perform necessary work tasks and he can engage in casual conversation.

5.      The claimant has no past relevant work.

6.      The claimant was born in June 1999 and was 23 years old, defined as a younger individual age 18-49, on the alleged disability onset date.

7.      The claimant has at least a high school education.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including [JOBS].

(Tr. 19-34.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 27, 2022, through the date of the decision on January 3, 2024. (Tr. 34.)

## V.      Plaintiff's Arguments

Plaintiff raises two assignments of error: (1) the ALJ's RFC finding was not supported by substantial evidence because she failed to sufficiently explain why she did not include the need for an employer to provide a bariatric chair (ECF Doc. 7, pp. 9-12); and (2) the ALJ erred by excluding or altering limitations included in the opinions provided by the state agency psychological consultants who reviewed Plaintiff's medical records (*id.* at pp. 12-18).

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

16

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.      First Assignment of Error: The RFC Was Supported by Substantial Evidence

In his first assignment of error, Mr. Dieter argues that the ALJ failed to build a "logical bridge" between the evidence and her findings because she did not explain why excluded "the need for a bariatric chair accommodation" from the RFC.  (ECF Doc. 7, pp. 9-12.)  In support, he points to (1) medical records showing he weighed over 300 pounds, (2) his sedentary RFC, and (3) two internet printouts his counsel filed with SSA, which state that the standard weight limit for an office chair is 250 lbs., while "big and tall" or "bariatric" chairs can support up to 800 lbs. (*Id.* at pp. 9-10 (citing Tr. 296, 298).)  He highlights the VE's testimony that a hypothetical individual who requires the use of a bariatric chair due to his size and weight would normally require an accommodation, and argues on that basis that "anyone weighing over 250 pounds who has been limited to sedentary work requires an accommodation by the employer, effectively precluding them from competitive employment."  (*Id.* at p. 11 (citing Tr. 65).)  The Commissioner responds that this argument should be rejected because Mr. Dieter "did not elicit any medical or vocational evidence that he required a bariatric chair."  (ECF Doc. 8, p. 8.)

17

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ bears the responsibility for determining the residual functional capacity, *see Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)), and should assess the "residual functional capacity based on all the relevant evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1). Relevant evidence in the case record may include: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations. SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

The claimant bears the burden to prove the residual functional capacity. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1003 (6th Cir. 2025) (stating the claimant bears the burden of proof in the first four steps of the sequential analysis, while the burden shifts to the Commissioner at step five); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999) (rejecting argument that the burden of proving the RFC shifts to the Commissioner at step five).

Mr. Dieter argues that "the unrefuted evidence in the record indicates that a standard office chair can only support up to 250 pounds before its integrity is compromised," and that a bariatric chair is therefore "necessary" for employees weighing over 250 pounds who are limited to sedentary work. (ECF Doc. 7, p. 20 (citing Tr. 296, 298); *see also* ECF Doc. 9, p. 2.) But the only evidence he offers to support this assertion is a set of incomplete, unauthenticated internet printouts discussing standard weight limits for office chairs and the availability of chairs with higher weight limits. (*See* Tr. 295-99.) Thus, the sole evidence relied upon by Mr. Dieter to establish that he cannot perform sedentary work without a bariatric chair is not, as contemplated

in SSR 96-8p, a medical opinion or other medical record; it is not evidence from his prior attempts to work; and it is not his own testimony regarding his activities or daily living or lay evidence from those who have observed his activities and/or limitations.  *See* 61 Fed. Reg. at 34477.  Instead, he relies entirely on an incomplete, unauthenticated internet printout that was filed but not mentioned in Plaintiff's pre-hearing brief, opening statement, or questioning of the VE.[3]  As the Commissioner correctly observes, "Plaintiff has identified no legal authority that requires an ALJ to create an RFC limitation based on a website post."  (ECF Doc. 8, p. 9.)

It is well established that an ALJ need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  Here, the undersigned finds no error in the ALJ's failure to address general assertions in two incomplete internet printouts when evaluating Mr. Dieter's RFC.  Further, since no other evidence was presented to suggest that Mr. Dieter required a "bariatric chair" to perform sedentary work, the ALJ also did not err in failing to discuss the VE's testimony that "it would normally require some sort of accommodation" if a hypothetical individual required a bariatric chair.  (Tr. 65.)

As the Commissioner observes (ECF Doc. 8, p. 9), other district courts have similarly held that an ALJ did not err in excluding a bariatric chair requirement from the RFC when the claimant failed to provide, for example, medical opinion evidence to support the requirement.  *See, e.g., Innocent v. Saul*, No. 1:18CV2391, 2020 WL 1031531, at *11 (N.D. Ohio Mar. 3, 2020) (noting the lack of evidence to support the alleged weight limit for office chairs, beyond

---

[3] A review of the hearing transcript reveals that neither the internet posts nor the alleged 250-pound weight limit were discussed by Plaintiff's counsel in his opening statement or his questioning of the VE.  (Tr. 45-48, 64-69.)  Neither were the posts or alleged weight limit addressed in Plaintiff's pre-hearing brief.  (Tr. 292-94.)

"an unofficial blog post and website," and also finding the plaintiff "would still need more to meet his burden, such as opinion evidence"); *Holcomb v. Commr. of Soc. Sec.*, No. 1:18CV0191, 2019 WL 1102250, at *11 (N.D. Ohio Jan. 14, 2019) (noting the lack of opinion evidence to support an RFC requiring use of a bariatric chair)*, report and recommendation adopted*, No. 1:18-CV-191, 2019 WL 1099548 (N.D. Ohio Mar. 8, 2019).

Mr. Dieter's citation to *Tucker v. Comm'r of Soc. Sec.*, does not change this analysis. (See ECF Doc. 7, p. 10 (citing *Tucker*, No. 1:22-CV-00001, 2023 WL 309392 (M.D. Tenn. Jan. 18, 2023), *report and recommendation adopted,* No. 1:22-CV-00001, 2023 WL 2208524 (M.D. Tenn. Feb. 24, 2023).)  The court in *Tucker* held that an ALJ had failed to adequately articulate the clinical examination findings she considered in evaluating a medical opinion.  *See* 2023 WL 309392 at *7-8.  Neither a medical opinion analysis nor clinical findings are at issue here.

For the reasons set forth above, the undersigned concludes that Mr. Dieter has not met his burden to show that the ALJ lacked substantial evidence or failed to build a logical bridge between the evidence and the result when she adopted a sedentary RFC that did not require a bariatric chair.  Accordingly, the undersigned finds the first assignment of error is without merit.

## C.  Second Assignment of Error: The ALJ Adequately Considered the Opinions of the State Agency Psychological Consultants in Assessing Plaintiff's Mental RFC

In his second assignment of error, Mr. Dieter asserts that the ALJ erroneously "excluded or altered" certain limitations in the state agency psychological consultants' medical opinions, including their opinions that: (1) Plaintiff "should be given occasional breaks to prevent worsening any psychological symptoms that may arise"; and (2) "[i]nteractions should be superficial if they are to happen."  (*See* ECF Doc. 7, p. 12; Tr. 76-77.)  The Commissioner responds that the ALJ appropriately analyzed the persuasiveness of the state agency opinions. (ECF Doc. 8, p. 10.)  The ALJ found the opinions "somewhat persuasive," as follows:

20

<u>The undersigned finds the opinion to be somewhat persuasive as the opinion is somewhat consistent and supported by the evidence received at the hearing level. As such, the undersigned has accounted for the opined superficial interactions within the adopted RFC with clarification.</u> Further, the evidence of record supports that the claimant's symptoms of anxiety and depression have improved with medication management and the claimant is able to engage with family, friends, and shop in stores monthly. While, at times, the claimant reported having symptoms of anxiety, was observed to be anxious, and testified to exacerbation of his symptoms while in public. At other times, psychiatric exams documented a normal mood. <u>As such, the degree of limitation supported by the evidence of record supports occasional, brief, and superficial interactions with supervisors, coworkers and the general public and no team or tandem tasks. Additionally, the evidence, does not support breaks outside of the normal breaks identified in the vocational expert's hearing testimony, as the psychiatric symptoms improved with medication and he did not require inpatient or emergency psychiatric care since the alleged onset date.</u> The claimant's ADHD has been accounted for in so limiting the claimant to work environments without strict production quotas. While also noting and considering the claimant's ability to manage his own self care, engage in activities of daily living, and his routinely observed normal judgment and cognition, which would not support that the claimant has the suggested limitation in his ability to adapt to changes.

(Tr. 31 (emphasis added).)  The undersigned will address the two challenged limitations in turn.

### 1.     Legal Framework for Evaluating Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

An ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, even where opinions were given "great weight" under the prior regulations, the Sixth Circuit noted that "there [was]

21

no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the

ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r*

*of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  Nevertheless, SSR 96-8p requires the ALJ

to consider all medical opinions in her RFC assessment and where her assessment "conflicts with

an opinion from a medical source," she "must explain why the opinion was not adopted." SSR

96–8p, 61 Fed. Reg. at 34478; *see Fleischer*, 774 F. Supp. 2d at 881.

### 2. The ALJ Adequately Articulated Her Findings Regarding the State Agency Psychological Consultants' Opinions Concerning "Occasional Breaks"

Mr. Dieter argues that the ALJ erred when she "incorrectly reject[ed]" the opinions of the

state agency psychological consultants that Mr. Dieter "should be given occasional breaks to

prevent worsening any psychological symptoms that may arise."  (ECF Doc. 7, pp. 12-16; *see* Tr.

76, 88.)  In response, the Commissioner asserts that "[t]here is nothing inherently inconsistent"

between the state agency consultants' reference to "occasional breaks" and the standard two

breaks and one lunch break that the VE testified is available in all competitive employment.

(ECF Doc. 8, pp. 10-11 (citing Tr. 64) (arguing the consultants "did not specify how frequently

those breaks would be, how long, or that they would be 'extra'").) Further, recognizing the

ALJ's apparent assumption that the opinions do reference extra breaks, the Commissioner argues

that substantial evidence supported her conclusion that the evidence did not support a need for

additional breaks outside of the standard breaks available to all employees.  (*Id.* at pp. 11-12.)

Pertinent to this limitation, the ALJ explained that "the evidence, does not support breaks

outside of the normal breaks identified in the vocational expert's hearing testimony, as the

psychiatric symptoms improved with medication and he did not require inpatient or emergency

psychiatric care since the alleged onset date."  (Tr. 31.)  Before making this finding, the ALJ

discussed Mr. Dieter's treatment with primary care and psychiatry for anxiety, depression, and

ADHD in detail, outlining subjective complaints, normal and abnormal mental status findings, medication changes, and responses to treatment.  (*See* Tr. 25-31.)  Both the summary and the underlying treatment records are consistent with the ALJ's finding that Mr. Dieter "did not require inpatient or emergency psychiatric care since the alleged onset date."  (Tr. 31; *see also* Tr. 29 ("He denied having participated in outpatient counseling or requiring psychiatric hospitalization.") (citing Tr. 554).)  The summary and evidence are also clearly consistent with the ALJ's finding that Mr. Dieter's "psychiatric symptoms improved with medication."  (*See, e.g.,* Tr. 29 ("He endorsed benefit with the use of Prozac and Clonidine for his anxiety and depression, however, these medication[s] did not address his ADHD symptoms.") (citing Tr. 547-48); Tr. 30 ("he reported that his anxiety was 'ok' with Clonidine" and "denied depression and reported difficulty with ADHD symptoms") (citing Tr. 562); *id.* ("the claimant's depression and anxiety were stable" but he felt Strattera "was not helping with his ADHD") (citing Tr. 608); *id.* ("he was having mild depression and increased anxiety" but "was able to focus better" with Vyvanse) (citing Tr. 625); *id.* ("his anxiety and depression were controlled and his ability to focus and concentrate was better on his medication regimen") (citing Tr. 623).)

In challenging the ALJ's finding that additional breaks were not supported by the evidence, Mr. Dieter argues first that the ALJ "fails to cite any evidence in the record that was used to support such a claim."  (ECF Doc. 7, p. 13.)  On the contrary, as discussed above, the ALJ provided a detailed discussion of the evidence that supported her conclusion that the records showed improvement with medication and no emergency or inpatient psychiatric care.  It is well established that an ALJ may rely on her previous discussion to support her opinion analysis, and need "not reproduce the list of . . . treatment records a second time."  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x

359, 366 (6th Cir. 2014)); *see Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  The

ALJ also need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the

evidence as a whole and reach[es] a reasoned conclusion." *Boseley*, 397 F. App'x at 199.

Mr. Dieter next argues that the ALJ "incorrectly reject[ed]" the state agency opinions

regarding his need for occasional breaks because the "medical records consistently show that he

is only able to focus for thirty minutes at a time and has difficulty staying focused and attentive

on the task because he is easily distracted."  (ECF Doc. 7, p. 13 (citing Tr. 72, 562); *see also id.*

(citing Tr. 52, 442, 445).)  In response, the Commissioner notes that the records cited by Mr.

Dieter as evidence of his inability to focus refer exclusively to his own subjective complaints of

attention problems, while his clinical examination findings instead show normal concentration

and persistence.  (ECF Doc. 8, pp. 11-12 (citing Tr. 72, 383, 392, 539, 557, 562).)

The Commissioner's observations are consistent with both the ALJ's decision and the

underlying records.  The ALJ acknowledged Plaintiff's testimony that "he would be unable to do

a job sorting nuts and bolts and he is consistently distracted," his complaints to providers of

"decreased concentration," "difficulty focusing," "being inattentive to tasks," and being "easily

distracted," and his ongoing treatment for ADHD.  (*See* Tr. 25-30.)  But she also cited clinical

examination findings showing he displayed normal attention, concentration, and/or persistence

and treatment records indicating that he reported being able to focus and concentrate better on

his psychiatric medications.  (*Id.*)  Mr. Dieter's reported difficulties with attention, as highlighted

in his brief, are not sufficient to deprive the ALJ's overall findings regarding his need for

additional breaks of the support of substantial evidence; the ALJ explicitly considered his

subjective complaints—along with his clinical findings, treatment modalities, and improvement

with medication—before finding the evidence does not support a need for additional breaks.

Mr. Dieter also argues "there is no evidence that his symptoms are completely cured," even if his "symptoms may have improved slightly with medication," (ECF Doc. 7, p. 13.)  This argument does not impact the analysis, since the ALJ did not find his symptoms were completely cured.  Instead, the ALJ adopted an RFC incorporating significant mental limitations, but found based on his reported improvement with relatively conservative treatment that a need for "breaks outside of normal breaks" was not supported by the evidence.  (Tr. 31.)

Mr. Dieter's citation to two unpublished district court decisions also does not change this Court's analysis.  (*See* ECF Doc. 7, pp. 14-15.)  In *James C. v. Comm'r of Soc. Sec.*, the court held that it was unable to trace the ALJ's reasons for rejecting a need "to take additional short breaks while at work if mental symptoms worsen while on the job" when the explanation was limited to a finding that the claimant able to concentrate for lengthy periods as "exemplified by his ability to play video games for 7-8 hours per day."  No. 2:23-CV-1098, 2024 WL 1464443, at *5-6 (S.D. Ohio Jan. 9, 2024), *report and recommendation adopted*, No. 2:23-CV-1098, 2024 WL 1268252 (S.D. Ohio Mar. 26, 2024).  Here, in contrast, the ALJ based her findings on both the conservative nature and the positive impact of Plaintiff's mental health treatment.  In *Andrew E. v. Comm'r of Soc. Sec.*, the court found that the ALJ did not adequately explain why she rejected the consultative examiner's limitations relating to concentration, persistence, and pace when the ALJ said the limitations were "not entirely consistent with . . . the examiner's findings regarding intact attention and concentration" without accounting for the examiner's objective observations that the claimant "'had problems concentrating' and 'often seemed to lose focus.'"  No. 2:24-CV-276, 2025 WL 724606, at *5-6 (S.D. Ohio Mar. 6, 2025).  Here, in contrast, it is evident that the ALJ's findings and explanations were consistent with the underlying records.

While Mr. Dieter may disagree with the ALJ's decision not to adopt an RFC requiring additional breaks, he has failed to show that the decision lacked the support of substantial evidence. *See Jones*, 336 F.3d at 477 (finding a court cannot overturn the Commissioner's decision, even if substantial evidence supports the claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ"). The ALJ's analysis also provides a sufficiently clear rationale for her decision not to include additional breaks in the RFC.

### 3. The ALJ Adequately Articulated Her Findings Regarding the State Agency Psychological Consultants' Limitation to "Superficial" Interactions

Mr. Dieter's final argument is that the ALJ erred when she defined "superficial" interactions in the RFC without first explaining why she did not adopt a different definition that was used by the Appeals Council in a separate, unrelated case. (ECF Doc. 7, pp. 16-18; *see id.* at p. 16 ("Because the Appeals Council definition was submitted as evidence, the ALJ was required to address it, which she did not do, thus constituting harmful error.").) He also argues that "the record is clearly contrary to" the ALJ's definition. (*Id.* at p. 17.) The Commissioner responds that the ALJ clearly explained why she did not adopt the definition used by the Appeals Counsel in a separate case, finding the Appeals Counsel order was "not applicable and binding outside the claim referenced in that order." (ECF Doc. 8, p. 13 (citing Tr. 17, 282-83).) The Commissioner also asserts that Plaintiff's additional argument that the record is contrary to the ALJ's definition is effectively an improper request to reweigh the evidence. (*Id.* at p. 14.)

Relevant to the state agency opinions that interactions "should be superficial if they are to happen," the ALJ said she "accounted for the opined superficial interactions within the adopted RFC *with clarification*," explaining that the evidence showed "the claimant's symptoms of anxiety and depression have improved with medication management and the claimant is able to engage with family, friends, and shop in stores monthly," and noting that mental status exams

sometimes "documented a normal mood," while at other times the claimant reported "symptoms

of anxiety" or "was observed to be anxious, and testified to exacerbation of his symptoms while

in public." (Tr. 31 (emphasis added).)  Consistent with her statement that she accounted for the

superficial interactions "with clarification," the ALJ defined superficial as follows in the RFC:

> able to be in proximity of others, able to exchange greetings, and able to engage in
> discussions that do not require persuasion, or involve team or tandem tasks.
> Interactions should be restricted to what is necessary to perform necessary work
> tasks and he can engage in casual conversation.

(Tr. 23.)  Plaintiff argues this was error because the ALJ did not discuss a remand order from an

unrelated social security appeal in which the Appeals Council provided the following definition:

> "superficial interaction" is a term that is readily defined, understood and applicable
> to a work setting, as it speaks to the depth, kind and quality of social interactions,
> and indicates that the claimant could not have sustained more than shallow or
> cursory interactions with others, i.e., coworkers, the general public, and/or
> supervisors.

(Tr. 282-3; *see* ECF Doc. 7, p. 16.)  However, as the Commissioner observes, the ALJ explained

her consideration of the definition in the unrelated Appeals Council decision as follows:

> The representative of record requested that a redacted Appeals Council order be
> exhibited in the claimant's claims folder which pertains to a different claimant for
> the purpose of referencing the Appeals Council's definition of "superficial
> interactions." (Exhibit 11E). While the correspondence was exhibited, the
> undersigned notes that the Appeal Council Order is not applicable and binding
> outside of the claim referenced in that order. Moreover, as "superficial interactions"
> is not a defined vocational term, the undersigned has provided clarification of its
> meaning, applicable in this claim, as referenced within the adopted residual
> functional capacity herein.

(Tr. 17-18; *see* ECF Doc. 8, p. 13.)

Consistent with the ALJ's explanation, and as this Court has previously explained, the

term "superficial" is not defined in the governing regulations.  *See Lopez v. Comm'r of Soc. Sec.*,

No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases).

Dictionary definitions also do not provide clarity as to what specific work-related interactions

should or should not be considered "superficial" in a vocational context.  *See id.* (quoting *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/superficial).  Accordingly, in situations such as this, where a term is not defined in the DOT or via expert vocational testimony, ALJs are instructed to clearly describe any assumptions on which the VE's testimony is based.  *Id.* at *20; *see* SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000) (stating VE testimony "generally should be consistent with the occupational information supplied by the DOT"); HALLEX I-2-6-74(C) (stating ALJs must "not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise"; and where a VE has based testimony "on an assumption," the ALJ must "ask the VE to clearly describe the assumption on the record"); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (finding HALLEX is "not binding on this court" but is persuasive authority).  Here, the ALJ followed governing regulations and internal procedures when she gave the VE a clear definition of the term "superficial" to apply in assessing available jobs for a person with the limitations in the RFC.  This was appropriate as the term was not defined in the DOT or via expert testimony.

Mr. Dieter argues that the ALJ's analysis amounted to harmful error because she did not adopt or "explain why she rejected" a separate definition of the term "superficial interaction" used by the Appeals Council in a separate, unrelated case.  (ECF Doc. 7, pp. 16-17.)  But the only authority he offers in support is a citation to *Fleischer v. Astrue*, where the court found that an ALJ's decision would not be upheld where her reasoning did not "build an accurate and logical bridge between the evidence and the result."  774 F. Supp. 2d at 877; (*see id.* at pp. 17-18).  Here, the ALJ clearly explained why she did not consider the Appeals Council decision,

noting that it "pertain[ed] to a different claimant" and was "not applicable and binding outside of the claim referenced in that order."  (Tr. 17.)  She also explained that she had provided her own clarification of the meaning because it was "not a defined vocational term" (Tr. 17-18), and later described specific record evidence that she relied on determining the degree of infrequent and superficial interactions that were supported by the record (*see* Tr. 31 (highlighting improvement of symptoms with medication, ability to engage with family and friends and shop in stores, clinical findings and complaints of anxiety, and normal clinical findings at other times).)  In this context, the ALJ's explanation built a logical bridge between the evidence and result.

As in his first assignment of error, Mr. Dieter's primary argument relies on a finding that the ALJ committed harmful error when she failed to specifically address a piece of evidence that lies outside of the traditional evidence ALJs are expected to consider in making a disability determination.  *See* 20 C.F.R. § 416.913(a) (defining "categories of evidence" to be evaluated in deciding a disability claim); SSR 96–8p, 61 Fed. Reg. at 34477 (stating relevant evidence may include: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations).  And as with the first assignment of error, Mr. Dieter has failed to provide legal authority to support the supposed requirement that his argument relies on.

As other district courts have held, a definition articulated by the Appeals Council in a single unrelated case is not binding on the ALJ in this case.  *See, e.g., Jared W. v. Comm'r of Soc. Sec.*, No. 2:22-cv-01786, 2022 WL 17842947, at *6 (S.D. Ohio Dec. 22, 2022) ("[A]n Appeals Council Order is limited in scope to the case specified and does not constitute broad-sweeping Agency action that is binding on the Agency at large or on this Court."), *report and*

*recommendation adopted*, No. 2:22-cv-1786, 2023 WL 1960600 (S.D. Ohio Feb. 13, 2023);

*Snodgrass v. Comm'r of Soc. Sec.*, No. 3:22-CV-1895, 2023 WL 5043045, at *5 (N.D. Ohio July

6, 2023) (citing *Jared W.*).  As the court in *Jared W.* explained:

> The Social Security Agency could define "superficial interactions," if it chose to
> do so, in any number of ways. The Social Security Act, as amended, along with
> Regulations, Social Security Rulings (SSRs), Acquiescence Rulings (ARs), the
> Program Operations Manual System (POMS), and the Hearings, Appeals, and
> Litigation Law Manual (HALLEX) provide the basic guides for adjudication and
> review of Social Security claims.

2022 WL 17842947, at *6.  Given the absence of any authority to support a finding that the

unrelated Appeals Council decision submitted by Mr. Dieter is binding or persuasive evidence

that must be addressed by the ALJ, the undersigned concludes that the ALJ did not err when she

declined to address the substance of that non-binding order in her decision.

Mr. Dieter also argues, with little elucidation, that "the record is clearly contrary to" the

definition of "superficial interactions" adopted by the ALJ.  (ECF Doc. 7, p. 17.)  In support, he

refers to his subjective complaints of anxiety and depression despite medications and the limited

nature of his interactions with family, friends, and others.  (*Id.*)  He again argues that his

medication "betters his psychological symptoms, it does not completely erase them."  (*Id.*)  The

Commissioner responds that Mr. Dieter's citation to his own subjective complaints essentially

"asks this Court to reweigh the evidence, which it cannot do under the substantial evidence

standard of review."  (ECF Doc. 8, p. 14.)  As discussed in Section VI.C.2., *supra*, a review of

the ALJ's written decision reveals that she considered the subjective complaints and limited

activities of daily living highlighted in Mr. Dieter's brief, but also considered his relatively

conservative treatment, improvement with medication, clinical findings, and ability to engage in

some limited interactions before adopting the RFC and definition of "superficial" that is set forth

in the underlying decision.  She did not find that Mr. Dieter's symptoms had been erased; rather,

she adopted a series of significant mental RFC limitations that she found to be supported by the evidence as a whole.  Mr. Dieter has not shown that the ALJ failed to consider relevant evidence or mischaracterized the evidence that was before her.

While Mr. Dieter may disagree with the ALJ's decision to adopt the definition of "superficial" interactions set forth in the RFC, he has failed to show that the definition adopted by the ALJ lacked the support of substantial evidence.  *See Jones*, 336 F.3d at 477 (finding a court cannot overturn the Commissioner's decision, even if substantial evidence supports the claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ").  The ALJ's analysis also provides a sufficiently clear rationale for her decision not to consider the merits of the unrelated Appeals Council decision and for adopting the definition of "superficial" interactions that she includes in the RFC.

For the reasons set forth above, the undersigned finds Mr. Dieter has not met his burden to show that the ALJ lacked substantial evidence or failed to adequately articulate her conclusion that the evidence did not support a need for additional breaks but did support a limitation to "superficial" interactions as she defined the term in her RFC.  Accordingly, the undersigned finds the second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


January 20, 2026                          */s/Amanda M. Knapp*
                                         _____
                                         AMANDA M. KNAPP
                                         United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).